Scruggs *vs.* Gibson *et al.*

S. P. GREEN, by brief, for plaintiff in error.

WIER BOYD, by HILLYER & BROTHER, for defendants in error.

---

E. G. SCRUGGS, plaintiff in error, *vs.* WILLIAM GIBSON *et al.*, administrators, defendants in error.

1. An affidavit that one is "justly indebted" to another so many dollars for rent, is an affidavit that said rent is due.
2. A distress-warrant in favor of two administrators, may issue on an affidavit of one.
3. It is not necessary, in an affidavit, to procure a distress-warrant for rent due, to specify the particular premises out of which the rent arises.
4. A witness, detailing the terms of a parol contract, may state, as one of the reasons why he is confident that his recollection is correct, that he stated the terms of the contract in the same way, to a third person shortly after the transaction.
5. When a witness was asked if he had not on a former trial sworn that he had told B. so and so, and he replied, no, and witnesses were introduced to show that he had, and other witnesses to show that he had not so sworn, and it was admitted that it was not a question of veracity, but of memory:  *Held*, that it was competent to introduce B. to show what in fact the witness had told him.
6. Where there was an agreement between A and B that B should cultivate A's land, but there was nothing said about the price, or the amount of the rent, and it was proven that there was a custom in the

neighborhood to rent land for one-third of the corn and one-fourth of the cotton to the landlord : *Held,* that there was an implied agreement to pay rent, according to the custom, and a distress-warrant would lie under section 4010, by the landlord, on his making affidavit of a specific sum due.  WARNER, J., dissents as to the 6th head note.

Distress-warrant.    Evidence.    Charge of Court.    Before REUBEN W. CARSWELL, Esq.    Glasscock Superior Court. August Term, 1869.

This case was begun by an affidavit by William Gibson, made on the 21st of December, 1868, in these words only, "that he is one of the administrators on the estate of Sterling Gibson, deceased, and that Cicero Gibson is the other, and that Edward G. Scruggs is justly indebted to them as such administrators, for rent, the sum of $398 00 the present year, and that said Edward G. has already removed from said premises a portion of his property, and is seeking to remove the balance, or other portion thereof." Thereupon a distress-warrant was issued and levied upon certain property of Scruggs.  On the 24th of December, 1868, Scruggs made a counter-affidavit, in which he stated simply that said sum so claimed to be due,, was not due, and gave security for the eventual condemnation money.

There was a trial before said term, but what was its result does not appear by the record.    The cause was again tried before Mr. Carswell, by consent, William Gibson being Judge of said Court.    On this trial, defendant's counsel moved to dismiss the proceeding because the affidavit was by but one of said administrators, because it did not speak of lands or tenements, nor locate or describe the premises for which rent was claimed, and because it did not state whether said rent was due.    This motion was overruled.

It was then shown by witnesses for plaintiffs, that during 1868 Scruggs occupied part of Sterling Gibson's plantation, about eighty acres, in a remote part of the county, and a doctor's shop on the place, which shop, though not needed by the estate, was worth $5 00 per month for rent, and a stable; that the usual charge for rented land was one-fourth of the

cotton and one-third of the other produce raised on the land; that Scruggs made ten bales of cotton, weighing from four hundred and twenty-five to four hundred and thirty-five pounds per bale on said place, in 1868; that he raised thereon also about one hundred and sixty or one hundred and seventy bushels of corn, five small stacks of fodder, about five bushels of peas; that corn sold at from $1 15 to $1.25, peas at $1 00 per bushel, fodder at $1 00, and cotton at from $22 00 to $27 00 per cwt.

CICERO GIBSON was introduced by plaintiff, and testified that he cultivated, in 1867, land broadside to that cultivated in 1868 by Scruggs, and that it was as good as that cultivated by him, and was asked upon what terms he rented the land in 1867. This question was objected to, and the objection was overruled, but it does not appear that the witness answered it.

SCRUGGS then testified, in his own behalf, that he had lived there eleven years, all the while occupying said shop, and that neither deceased nor his administrators had ever charged any rent for it; that in 1868 he used a common stable for his two horses; that he was employed by Judge Gibson in 1868 to superintend the place, and he was pleading in another case the value of his services as a set-off; that he cultivated but fifty acres of land in 1868, made ten bales of cotton, weighing 4,437 pounds net, sold five for $20 50, and five for $22 00 per cwt., and made one hundred and eighty bushels of corn; that he never was charged any rent for the land, nor agreed to pay any to any one; that in the winter of 1867, Judge Gibson said to him "there are about fifty acres of land over there, which will not be tended; as you have a spare horse, you can have that land, and are welcome to all you can make on it; if you do not, it will lay idle;" adding that he must fix up the fences; that Judge Gibson returned in June, 1868, but never said a word about rent of any kind for land, stable or shop. He further testified, that he spent $64 00 for fertilizing the land, and repaired the fences; that this fertilizing increased the yield one hundred per cent., and that said land was not worth over $1 00 per acre for rent; that only two

hundred and fifty acres of the four hundred composing the plantation was cultivated in 1868; that in the fall of 1868, Judge Gibson wrote him an insulting letter, claimed rent, and refused to arbitrate the matter.

Another witness swore to the repairing of the fences by Scruggs.

In rebuttal, Judge GIBSON swore, that Scruggs applied to him to rent the land, and he told him he could have it, and that nothing more was said by either of them; he intended charging rent, but did not tell Scruggs so, nor made any contract with him except as last aforesaid. Shortly after this conversation, on going away from the place, supposing Scruggs might think that he was to have said land for one-third and one-fourth as aforesaid, he, Judge Gibson, told his brother that he had let Scruggs have the land, and asked him to tell Scruggs that he intended charging one-third of everything raised, as rent, but his brother did not deliver the message. What witness said to his brother came in over the objection of Scruggs' counsel. While on the stand, Judge Gibson was asked if he had sworn on the former trial that "shortly after said conversation with Scruggs, he supposed Scruggs might believe from the conversation that he was not to pay any rent, and told his brother to go and tell Scruggs he would charge one-third and one-fourth." He denied having so sworn.

In surrebuttal, Scruggs said he was certainly correct as to what he had testified as to the way in which he was allowed to use said land, and that Judge Gibson's brother did not deliver said message. Several witnesses testified that Judge Gibson did, on the former trial, testify as above quoted, and plaintiff introduced witness, who testified that he did not. It was said here that this was done with no view of attacking Judgs Gibson's veracity, but to test his memory.

Defendant's counsel requested the Court, in writing, to charge the jury: 1st. That if, after said first conversation, Judge Gibson had any reason to think that Scruggs understood that no rent was to be charged for the land, it was Gibson's duty to notify Scruggs that he meant differently, and if he did not, the jury was authorized to presume that Gibson

Scruggs *vs.* Gibson *et al.*

intended to make no charge.  2d. That neither affidavit is evidence; the plaintiffs must make out their case by evidence. And 3d. That distress did not lie in this case, unless there was an agreement to pay a specific sum for rent, or something the value of which could be rendred certain, and that if this was not shown, there could be no recovery in this case, though there might be in an action for use and occupation.

The Judge gave in charge the first request, with the addition, that if Scruggs had any cause to suppose Judge Gibson misunderstood him, it was Scruggs' duty to notify Gibson, and if he failed to do so, he was bound by Gibson's understanding.  The second request he gave, and refused to give the third.

He further charged the jury as follows:  "It is not pretended that there was any express contract to pay rent.  If you believe, from the evidence, that defendant went into the possession of the land of the estate, occupied and cultivated it, the law implies a contract to pay what rent the land was worth.  It is not necessary that there should have been an express contract to pay rent in money or anything.  If you find that there was such an implied contract, plaintiffs must recover in this case what they have shown the land was worth, unless the understanding between the parties was that no rent was to be paid.  You must decide from the evidence.  I know of no law in Georgia by which one man can use the property of another, reap benefit and profit from its use, and not pay him just compensation.  He must pay him just and fair compensation for its use, unless by express agreement and contract he was to have it for nothing and without charge for its use.  I see no reason why a distress proceeding should not be good in this case as well as in all others, if you find there was an implied contract, and if you believe plaintiffs did not waive the right to charge rent."

The jury found for plaintiff $252 50 and costs of suit. Defendant sued out his writ of error, assigning as errors the refusal to dismiss said cause, the refusal of the evidence of what rent Cicero Gibson paid in 1867 for the land cultivated by him, the allowance of what Judge Gibson said to his

brother as evidence, the qualification of the first request to charge, (because the qualification was upon an hypothetical state of facts,) the refusal to charge the third request, and the charge, as given, especially that part stating that distress would lay in such a case.

E. H. POTTLE, for plaintiff in error.

A. R. WRIGHT, by W. HOPE HULL, for defendants in error.

McCAY, J.

1. The affidavit that the defendant is "justly indebted," amounts to an affidavit that the debt is due. It is the form prescribed by law to make such an affidavit in cases of attachment, and it was sufficient to hold defendant to bail as for a debt due: Rev. Code, secs. 3200, 3341.

2. We see no reason why one administrator may not make the affidavit. One tenant-in-common might distrain in the name of all at common law: Archbold L. & T., 110; and one administrator may verify a bill or bring a suit in the name of both. Besides, the oath may be by an agent, and surely one administrator is the agent of the other at least, for such a purpose as this.

3. Nor is it necessary to describe the land out of which the rent issues. The statute does not so require. This is a summary process, and the very intention of it is to waive forms and particularities, looking only to the issue, to-wit: that there is money due for rent. Perhaps if the rent were not due, there might be some such description necessary, because it only lies in such a case where the tenant has removed, or is removing his property off the premises: Revised Code, sec. 2259.

4. The whole of the difficulty as to the admissibility of the statement, as to what the witness, William Gibson, told his brother and the subsequent admission of the brother grows out of a total misconception. We see no objection to Judge Gibson stating, as evidence of the correctness of his memory, that he told his brother so and so just after the

thing transpired.  It is no evidence of what did transpire.
That depends on the oath of the witness.  This is but his
reason for thinking his memory correct, and is nothing more
than the frequent statement of witnesses that they are sure
they remember correctly, because so and so.

5. If the defendants see fit to take issue as to the faithful-
ness of the witness' memory, and ask him if he has not, on
a former trial, given a different version, not of the fact in
dispute, but of what he told his brother, and on his saying
no, undertake to show that he has given such different ver-
sion.  We see no objection to showing what he in fact did
tell his brother.  It goes to show that he did not state the
matter on the former trial as was contended.  Nothing is
more common than for one to say, I know I did not say so
and so, because it was not true, and I could not have said it.
None of this evidence, on either side, was evidence on the
matter in dispute between the parties.  It was only legal at
all, because there arose a collateral dispute as to the correct-
ness of Judge Gibson's memory.  The whole of it was per-
tinent and competent to settle that issue, otherwise it was
worthless and immaterial.

6. The principal point upon which this case turns is the
charge of the Court that a distress-warrant will lie in Geor-
gia on an implied contract for rent.  Undoubtedly it was the
rule at common law that a distress-warrant will not lie unless
the rent be for something certain, or for that which may be
made certain:  Archbold Land. & Ten., 106.  But there
may be an *implied* contract for a sum certain.  As if A let B
have $10 00 in money, the law implies a contract to pay back
$10 00.  So if a tenant, at a fixed rent, hold over, the law
implies that he will pay the same rent the second year:
Archbold Land. & Tenant, 65.  Or if he go in as a tenant
and nothing be said about the amount of the rent, if he *pay*
one year, the law implies a contract to pay the same rent for
other years:  Knight vs. Bennett, 3 Bing., 361.  Or if he
go in on a lease *fixing* rent, which lease is for any reason
void, the law implies that he will pay the amount mentioned
in the lease:  Clayton vs. Blackley, 8 T. Reports, 3.  And

in these latter cases it was held that the remedy by distress existed.

*Here* there was an express agreement that Scruggs should have the land; he was no trespasser, not even a tenant-at-will, or by sufferance, but a tenant for the year. That is admitted by both parties. It was in proof that the custom was to pay one-third of the corn and one-fourth of the cotton. It is admitted that if that had been the *express* agreement distress would lie, because it may be made certain what the rent is; and this is supported by the authorities.

It is clear from the cases above referred to that it is no objection to the rent that it is under *an implied contract*, provided it be implied for a sum certain, or for a thing that may be made certain. We think, therefore, as in this case, the custom was proven that the law implies the tenant should pay according to the custom, to-wit: one-third and one-fourth, and as this may be made certain, that it is sufficient, even at common law, for a distress. But we do not put our judgment in this case upon the sole ground that under the facts as they appeared before the jury, the plaintiff below had a right to distrain at common law. We hold that the common law rules regulating distresses for rent are not of force in this State. By the Act of 1810, it was expressly enacted that distress-warrants were abolished, and rents should be collectable as other debts. Previously to that time the old common law right of the landlord to seize the property of the tenant, with the restriction placed upon it by various English statutes in force at the time of our adopting Act, was in full force in this State, but by that Act (1810) the whole thing was repealed, and the landlord was left to the use of such remedies as were provided for other creditors. In 1811, Prince's Digest, 687, an Act was passed "For the collection of rents." That Act has been transferred, word for word, into the Code, sections 4010, 4012, and has been the law of this State from its passage until now. It is true, it calls the process, which it authorizes the magistrate to issue, a distress-warrant, but an inspection of the Act will show that it has but the slightest shade of a resemblance to the proceeding

known in England by that name, which was completely swept from our law by the Act of 1810.

The common law distress had the following characteristics: 1st. The landlord himself, of his own motion seized the tenant's property, or he appointed a baliff or agent of his own to do it. 2d. The distress could only be made on the land rented, and whilst the tenant remained in possession. 3d. It must at common law be made during the term, or in six months after its expiration. Archbold, 112. 4th. No property could be seized, except such as was on the premises, and if the tenant should remove any property, it could not be seized. Archbold, 113. 5th. Any property could be seized if found on the premises, whether it belonged to the tenant or not, except in certain special cases, for the benefit of trade. Archbold, 114. 6th. The relation of landlord and tenant must in fact exist, by either express or *implied* contract. Archbold, 106. 7th. The rent, reserved or implied, must be certain, or be capable of being made certain. Archbold, 106. A want of either of the above requirements was fatal to a distress at common law, and each of the circumstances mentioned was incident to the right. Archbold, 106–116. By our statute of 1811, but one of these requisites is necessary; the relation of landlord and tenant must exist. It must be for rent. By the Act of 1811, the distress must be made by a constable or sheriff, on a warrant issued by a magistrate, on the oath of the person claiming *the rent*.

The section of the Code is as follows : " Any person who may have rent due, when the sum does not exceed fifty dollars, may, himself, his agent or attorney, make application to a Justice of the Peace, within the district where the tenant may reside, or where his property may be found, and obtain from such Justice a distress-warrant for the sum claimed to be due, on the oath of the principal, his agent, or attorney, in writing, for said rent, which may be levied by a constable duly authorized, on *any property* belonging to the tenant, whether found on the premises or elsewhere. Revised Code, section 4010.

The language of the Code is, any *person* having rent due.

Scruggs *vs.* Gibson *et al.*

The landlord cannot distrain. He can only by his oath procure a distress-warrant from a magistrate, to be executed by an officer. The levy may be made on any property of the defendant, wherever found. It need not be on the land, nor can the levy be on any property belonging to other persons; nor is it necessary that the tenant be in possession. It need not be during the term. Nothing is required by this Act but that it shall *be for rent* and *be due.* The statute does not say it shall be due by an *express* contract, but simply due. It does not say it shall be for a sum certain, but simply that it shall be due for rent. It is in fact nothing but a mode of commencing a suit for a debt due for rent. The only requisite is that it shall be for rent *due,* and even that, by section 2259 of the Code, is not essential, since there may, under certain circumstances, be a distress-warrant issued when the rent is not due.

It appears absurd, when every other peculiarity of a common law distress is done away, to insist that the distress can only issue when the rent is for a sum certain, expressly agreed upon. The statute does not so require. It simply says rent due, no matter whether by express or implied contract, no matter whether it is a fixed sum, or due on a *quantum valebat.* Indeed, the section of the Code immediately preceding distinctly recognizes the idea, that *rent* may be due on a *quantum valebat.* Since, in proceedings against a tenant holding over, it authorizes a judgment against a *tenant-at-will,* when no amount has been agreed upon, for double the amount the property is *proven to be worth as rent.* We hold, therefore, that under our law, nothing is required, except that there shall be rent due. The relation of landlord and tenant must have existed during the period for which the debt is claimed. In this case, that is admitted. Scruggs was not a trespasser. He held the land under Gibson. If under that holding there is rent due, this proceeding is well founded.

And we affirm the judgment of the Court.

BROWN, C. J., concurred, but wrote out no opinion.

Scruggs *vs.* Gibson *et al.*

WARNER, J., dissenting.

The question presented for our consideration and judgment in this case is, whether the plaintiff is entitled to *distrain* the defendant's goods and chattels for rent due, on the statement of facts contained in the record.    This is a question of practical importance, and should be settled in accordance with *the fundamental principles of the law* governing that particular class of contracts.    The evidence in the record is, that the plaintiff told the defendant, who was then living on the land, that he could have fifty acres of it, intended to charge him for it, but did not tell the defendant so; made *no contract with him for rent, no amount was specified,* nor was anything said about *payment.*    The Court below on the trial of the case charged the jury; "it is not pretended that there was any express contract to pay rent; if you believe from the evidence that defendant went into the possession of the land of the estate, and occupied it, and cultivated it, the law implies a contract to pay what the land was worth; it is not necessary that there should have been an express contract to pay money or anything.    If you find that there was such an implied contract, the plaintiff must recover in this case what he has shown the land to be worth, unless you find that the understanding between them was that no rent was to be paid. I see no reason why a distress proceeding should not be good in this case as well as in all others, if you find there was an implied contract."    In my judgment, this charge of the Court was erroneous, in view of the facts of the case, and the law applicable thereto.    The question was not whether the plaintiff was entitled to recover, in a proper form of action, for the use and occupation of the land, what the law would imply the same to have been reasonably worth, according to the custom of the neighborhood, or otherwise, but the question was, whether the plaintiff was entitled, under the law, to *distrain* the goods and chattels of the defendant, for rent due, on the statement of facts then before the Court.

When there is no express contract on the part of the alleged tenant to pay a certain sum of money for the rent of

the land, or any other specific thing for the rent thereof, can the plaintiff *distrain* for rent due, under the laws of force in this State? What is rent, in the legal acceptation of the term? Blackstone defines rent to be " a *certain profit* issuing yearly out of lands and tenements corporeal. It may consist in services or manual operations, as to plough so many acres of ground, to attend the king or the lord to the wars, and the like; which services, in the eye of the law, are profits. This profit must also be *certain*, or that which may be reduced to *a certainty by either party.*" 2d Blackstone's Commentaries, 41. Rent, as defined by Chancellor Kent, is "a *certain profit* in money, provisions, chattels, or labor, issuing out of lands and tenements in retribution for the use. There were at the common law, according to Littleton, three kinds of rent, to-wit: rent service, rent charge, and rent seek. *Rent service* was where the tenant held his land by fealty, or other corporeal service, and a *certain rent*, and it was called rent service because there was some corporeal service incident to the tenancy, as fealty, homage, or other service. A right of *distress* was inseparably incident to *this rent.*" 3d Kent's Commentaries, 460. Blackstone says that for neglecting to do suit to the lord's court, or other *certain personal service*, the lord may distrain of common right. 3d Blackstone's Commentaries, 7. The principle to be deduced from these authorities is, that the right of *distress* was by the common law confined to *rent service*, which was for a *certain rent*, or such as might be reduced to a *certainty.* To entitle a person to *distrain* for non-payment of money, it must be due under a *demise* and for rent *fixed* in its nature, and if therefore a person be let into possession under an agreement for a lease which does not contain words of immediate demise, no distress can be made, unless from a previous payment of rent, or other circumstance, a tenancy from year to year can be inferred, and the only remedy is by action for use and occupation. Lord Coke quaintly says, " it is a *maxim in law*, that no distress can be taken for any services that are not put into *certainty*, nor can be reduced to *any certainty* for *id certum est quod certum reddi potest*, but yet in some cases there may be a

certainty in uncertainty. Therefore, if a man hold land paying so much *per acre*, although in the terms of the demise *the number of acres* be not fixed, the lord may distrain. But where an estate has been let without in any way *fixing the amount of rent*, the only remedy is by action." 3d Blackstone's Commentaries, 7, note. In Dunk vs. Hunter (7th English Common Law Report, 116) Abbott, C. J., said : " A party has no right to *distrain*, unless there be a *fixed rent agreed upon;* if that be not so, the law gives him a remedy by the action for use and occupation. There can be *no distress*, unless there be a contract for an actual demise, at a *specific sum*." In Regnart vs. Porter, (20th English Common Law Reports, 196,) Tindall, C. J., said : "Before a landlord takes into his hand the speedy remedy of distress, he must see that the *amount of rent to be demanded* has been settled with *precision*." "Distress for rent will not lie, unless there be an *agreement for a sum certain*, either in writing, or by parol :" Jacks vs. Smith, 1st Bay's Reports, 310. Smith vs. the Sheriff of Charleston, Ibid, 438. "A landlord has no right to *distrain* and sell the goods of his tenant for the use and occupation of demised premises, unless the rent by *agreement of the parties is certain*, either in *money*, or *services*, or is such as may be reduced to *certainty:*" Valentine vs. Jackson, 9th Wendell's Reports, 302. "A claim for an *unliquidated* amount of rent, without an *express contract*, will not authorize a *distress*": Roberts vs. Tennell, 4th J. J. March's Reports, 160. According to the living principles of the common law, of force in this State, applicable to rent contract, no distress-warrant can be taken out and enforced for the non-payment of rent, unless there has been an express contract between *the parties* that the alleged tenant should pay rent, either in money, or other specific thing; the rent agreed to be paid must be *fixed* and *certain*, or of such a specific nature as may be reduced to a *certainty*. But if there has not been any *express contract* between the parties to pay any *certain* or *fixed* sum, or other *specific thing*, for the use of the land, the remedy of the plaintiff is not by distress-warrant against the defendant cultivating the land, but the remedy of the plaintiff is by an action

for use and occupation of the land, to recover of the defendant what the use and occupation of the land is reasonably worth. These living principles of the common law, have not, in my judgment, been repealed or abrogated by the Code, so far as the legal right to *distrain* for the non-payment of rent is concerned. For it is one of the essential elements of a rent contract which will authorize the landlord to *distrain* for rent due, that the amount of the rent, or other service to be rendered for the use of the land, should be *fixed* and *certain* by the *express contract of the parties*. The summary remedy by distress is given to the landlord for the non-performance of that which the tenant *expressly agreed* to pay, or to render, for the use of the land when he was let into the possession thereof, and not for that which the law would *imply* the use of the land was reasonably worth, either by the custom of the neighborhood, or otherwise. The 2259th section of the Code declares that the landlord shall have power to distrain for rent as soon as the same is due, or before due, if the tenant is seeking to remove his goods from the premises. If the tenant fails to pay *the rent due at any time*, the landlord may re-enter immediately and dispossess the tenant. The 4010th section of the Code provides the manner in which a distress-warrant for rent due shall be taken out. But the Code is silent as to what are the particular contracts under which rent is claimed, which the landlord may enforce by *distress and sale* of the tenant's goods and chattels. The landlord has the power to *distrain* for the non-payment of rent, under the Code, and so he had the power and authority to *distrain* for the non-payment of rent by the common law, but in what cases? The Code does not specify, and therefore, we must look to *the common law* for our guide in that respect. The Code must be construed in the light of the common law; that is to say, in all cases where by the common law the landlord was authorized to *distrain* for the non-payment of rent due, he can do the same thing under the Code. The Code only authorizes the landlord to distrain for rent due, in all cases where by *law* he would be entitled to distrain therefor, and the common law, as we have already shown, regulates and controls that

question. The Code furnishes the remedy by distress-warrant for the non-payment of rent ·due, and under certain circumstances, when not due, but when we desire to ascertain the particular state of facts which will enable us to employ that remedy, we must look to the common law for instruction, and regulate our conduct by it. Take this case and propound the question, can the plaintiff *distrain* the defendant's goods and chattels, under the state of facts contained in the record, for the non-payment of rent ? The Code will not decide the question by reference to its provisions, but the common law is clear on the point of inquiry. The Code intended to give the power and authority to *distrain* for rent due, in all cases where by the common law such proceedings was allowed, and not otherwise. It is a sound rule of construction, that when a statute makes use of words the meaning of which are known to the common law, the words shall be understood in the same sense, and therefore, the words "distress for rent due," or "distrain for rent due," should receive the same construction and interpretation when used in the Code, as the same are understood and interpreted by the common law. In Cornell vs. Lamb, (2d Cowen's Report, 656,) Woodworth, J., said : "Our Act concerning distresses does not expressly define what shall constitute *a right to distrain ;* it would seem, therefore, that where there is not a clause of distress, the landlord's right to this remedy cannot be more extensive than that given by *the common law,* which is limited to *rent service."* Again, on page 657, " the Act concerning distresses does not expressly define the cases, in which *a distress may be lawful ;* I think it, however, manifest from its provisions that *the common law right* was not intended to be abolished, but preserved *in full force."* Anciently, the lord, the landlord as we now call him, could enter upon the demised premises and distrain his tenant's goods and chattles for the non-performance of rent service which the latter had *agreed* to perform and render ; the law allowed the landlord to be his own avenger or to minister redress to himself for non-payment of rent, or other duties. But as the exercise of this right was liable to great abuse and oppression, the right to *distrain* has been *regulated*

*by law.* The 4010th section of the Code prescribes the manner in which the landlord must proceed to distrain for rent due, and in all cases in which he may distrain for rent due by the common law, he may have a distress-warrant therefor under the provisions of that section of the Code, but in no other. The party distraining must show *the authority of law*, upon a given state of facts, which will authorize him to take out a distress-warrant for rent due and distrain the alleged tenant's property; otherwise, he will be a trespasser. If *the facts* of the case under *the law*, would not entitle him to distrain for rent alleged to be due, the taking out a distress-warrant therefor would not protect him. This speedy and harsh remedy can only be employed in such cases as are *authorized by law*, and it has been already shown in what cases the law *does*, and in what cases it *does not* authorize it. The majority of the Court in this case place their judgment on the ground that inasmuch as there was evidence of a custom in the neighborhood to rent land for one-third of the corn and one-fourth of the cotton, to be paid to the landlord, therefore, there was an *implied* agreement on the part of the defendant to pay rent according to that custom, and that the plaintiff, on making oath of a specific sum due for rent, was entitled to have a *distress-warrant* therefor, under the 4010th section of the Code. However true this position of the majority of the Court might have been, as to the *implied* liability of the defendant to pay what the rent of the land was reasonably worth according to the custom of the neighborhood, had an action been brought by the plaintiff for *the use and occupation* of the land by the defendant, I deny, that under the law, the plaintiff was entitled to *distrain* the defendant's goods and chattels for rent due on this *implied* contract, and I contend that the affidavit of the plaintiff as to the specific sum due under this *implied* contract, did not alter or change the law as to his right to *distrain* the defendant's property under such *implied* contract. It might be a sufficient reply to this assumed position of the majority of the Court to say, that the authorities already cited, establish beyond controversy, that the plaintiff was not entitled to *distrain* for rent due on an

Scruggs *vs.* Gibson *et al.*

*implied* contract of this character; but, as was said by Chief Justice Tindall, in Regnart vs. Porter, "Before a landlord takes into his hands the speedy remedy of distress, he must see that *the amount of rent to be demanded* has been settled with *precision.*"    The amount of rent to be demanded is not to be settled by the landlord in *his affidavit for the distress-warrant*, but it must be settled by *the rent contract between the parties,* otherwise, *the affidavit* of the landlord would regulate and determine *his right to distrain* the goods and chattels of the defendant, instead of *the law applicable thereto.*    All that can be said in this case, is that the defendant occupied the land by the consent of the plaintiff, but he never *agreed* to pay him one-third of the corn and one-fourth of the cotton, or any other *fixed* and *certain* amount for the rent of it; consequently, the alleged tenant has not committed any *breach of fealty* to the plaintiff as his landlord by the non-performance of any *rent* contract, or for the non-performance of any other stipulated *rent* service *agreed* to be paid or rendered on his part, which would authorize the plaintiff as his landlord under the law, to *distrain* his goods and chattels, even if the relation of landlord and tenant can, with legal propriety, be said to have existed between the parties.    The 4005, 4006, 4007, 4008 and 4009th sections of the Code relate only to the remedy against tenants *holding over,* and have no relation to the remedy by *distress-warrant for rent due.*    The right of the landlord to *distrain* for rent, is based on the fundamental principle of the law, that there has been a *breach* of the express contract by the tenant, under the terms of which he was let into the possession of the rented premises, that he has violated the terms of the rent service which he *expressly agreed to render for the use of the land,* and therefore, the terms of that rent service must be *fixed,* and *certain,* so that the Court may see that there has been such a breach of that express contract on the part of the tenant as will entitle the landlord to *distrain* for the non-performance of *the rent service* which the tenant *expressly agreed to render to him for the use of the rented premises.*    To entitle the landlord to distrain the goods and chattels of the tenant for non-payment of rent, he

must show that the tenant was let into the possession of the rented premises under an express contract to pay a *fixed cer-tain* sum of money therefor, or to render some other *fixed* and *certain* specific service for the use thereof, and that the tenant has failed or refused to perform *that express contract*. It is in that class of cases only, that the landlord is entitled to the speedy and harsh remedy of a *distress-wrrrant* for the non-payment of rent, under the law. The reason of the law which allows the landlord to have the speedy and harsh remedy of distress against his tenant for the non-payment of rent is, that the tenant has *violated the express terms of the contract under which* he was let into the possession of the land by the landlord; and therefore, the amount of rent or other specific service which the tenant *agreed* to pay, or ren-der therefor, must be *fixed* and *certain* to entitle the landlord to *distrain*. There can be no distress for rent claimed to be due on an *uncertain, implied contract,* when the amount ac-tually due is to be ascertained by the verdict of a jury by implication of law, as to what the use of the land is reasona-bly worth by the custom of the neighborhood, or otherwise. If the tenant is let into the possession of the land without any express contract as to the payment of rent therefor, or as to any certain specific service to be rendered by him for the use thereof, the law will raise an *implied* undertaking on his part to pay what the use of the land was reasonably worth, and in that class of cases the law affords the landlord a remedy by an action for use and occupation; but he cannot have the summary remedy by *distress-warrant* on an *implied* contract raised by operation of law, to collect, in *that way,* what the use of the land is *reasonably worth.* The fact that the land-lord may re-enter immediately and dispossess the tenant if he fails to pay the rent due at any time, as provided by the 2259th section of the Code, clearly contemplates that 'the amount of rent due should be *fixed* and *certain by the con-tract of the parties;* otherwise it would be entirely in the power of the landlord to judge for himself and say what amount was due on an *implied* contract for rent, and dispos-sess the tenant immediately.

In this case there was no contract made 'with the defend-ant for *payment of rent,* no amount specified, nor anything said about payment of rent for the use of the land, and I am clearly of opinion, both upon principle and authority, on the statement of facts contained in the record, that the plaintiff was not entitled to *distrain* the defendant's goods and chat-tels for rent claimed by him to be due in his affidavit for a distress-warrant.   There was no *certain* or *specific* rent ser-vice *agreed* to be paid, or rendered, by the alleged tenant, to the plaintiff, when he was let into the possession of the prem-ises, for the use thereof; and the right of the plaintiff to *dis-train* for rent due, did not exist under the law.   The right of the landlord to *distrain* for rent due under the law, is con-fined to *rent service,* and is inseparable from it, that is to say, to such *certain* rent service as the tenant *expressly agreed* to pay, or render to the landlord, when he was let into the pos-session of the land, for the use thereof, and not otherwise. The law does not authorise the landlord to *distrain* for rent claimed to be due on an *implied* contract.   I am therefore of the opinion that the judgment of the Court below, should be reversed.